THE JUNCTION MINING COMPANY

*v.*

THE SPRINGFIELD JUNCTION COAL COMPANY.

*Opinion filed October 23, 1906.*

1. MINES—*mining lease construed as to right of lessee to change location of structures.* A provision of a mining lease authorizing the lessees to remove machinery, tenement houses, appurtenances and improvements from their present location to other places upon the demised premises, as they may deem proper, authorizes the removal of hoisting machinery and top works from an unsafe shaft to a safe one, and does not contemplate that upon the termination of the lease the structures so moved shall be returned to their original location.

2. SAME—*when lessor cannot complain of violation of a lease.* Violation of a provision of a mining lease against mining coal from lands adjoining the demised premises cannot be complained of by the lessor, where the person from whose lands the coal was thus mined by in-strike was a stockholder in and treasurer of the lessor corporation, which received royalty upon all the coal so mined with full knowledge of the source of such royalty.

3. SAME—*when lessee is not obliged to re-build burned buildings.* A covenant by the lessee of mining property to surrender the tenement houses, personal property and fixtures at the expiration of the term in as good condition as when received, ordinary wear and tear use excepted, is not a covenant to repair or re-build, and does not require the lessee to re-build tenement houses which were destroyed by fire during the term of the lease, and which at the beginning of the term were old abandoned buildings not used in connection with the mine.

4. SAME—*common law duty of lessee as to re-building.* At common law, in the absence of an express agreement, a tenant for years is only bound to treat the premises in such manner that no substantial injury shall be done through his negligence or willful miscon-

duct, and while he must make fair and tenantable repairs, he is not bound to re-build premises destroyed by fire or otherwise becoming ruinous, nor bound to replace any portion thereof worn out by time.

5. SAME—*law does not require both an escapement shaft and an escape way.* In order to constitute demised premises an "entire mining property" when surrendered by the lessee at the end of the term it is not essential that the mine have both an escapement shaft and an escape way through another mine, since section 3 of the Mines act only contemplates one or the other.

6. APPEALS AND ERRORS—*when a cause will not be remanded to enable party to prove damages.* Where four years have elapsed between the beginning of a chancery suit and the closing of the complainant's proofs, the cause will not be remanded by an appellate court to enable the complainant to make more full and specific proof of damages upon certain aspects of the case.

7. SAME—*when absence of cross-error defeats enforcement of compensation.* In litigation respecting the surrender of leased mining property, where the master in chancery refuses to allow the defendant's claim for the expense of constructing an escapement shaft on the ground that it was not located upon the demised premises, if no objection is made to the master's action and no cross-error assigned when the complainant appeals from the decree, a court of review cannot enforce compensation therefor upon the ground that the shaft was either a permanent improvement or an accretion, which should have been accepted by the lessor with the other premises and paid for under the provisions of the lease.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. J. A. CREIGHTON, Judge, presiding.

NEWMAN, NORTHRUP, LEVINSON & BECKER, JAMES M. GRAHAM, and C. E. CLEVELAND, for appellant.

PATTON & PATTON, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

We have given this record careful investigation, and are of opinion that under the facts of the case, and the law applicable thereto, substantial justice has been done the parties by the decree of the circuit court. We concur in the views of the Appellate Court in its opinion by Mr. Justice Baume

affirming the decree of the circuit court and adopt said opinion, which is as follows:

"June 24, 1887, appellant corporation executed a lease to Thomas R. Gray, Robert C. Solomon and Anna M. Loose of certain coal mining property, consisting of real estate, coal shafts, right of way, sidings, switches, tenement houses, personal property, fixtures and appurtenances belonging or in anywise appertaining to such coal mine, for the term of ten years from July 1, 1887. The lessees were given the exclusive right, by means of mines or shafts then located upon the premises or to be by the lessees located or opened thereon, and not otherwise or in any other manner, of searching for, taking and mining so much of the coal under the lands described as could be properly taken therefrom, leaving proper and sufficient support to the surface. The lessees were also given the right and privilege of removing part or all of the machinery, tenement houses, appurtenances and improvements from the place or places where the same were then located, to such other place or places on the demised premises, but not elsewhere, as they might think proper. By the terms of the lease the lessees agreed substantially as follows:

"1. To take the demised premises and mining rights as an entire mining property, and for the purpose of mining and selling the coal underlying the demised premises, as speedily and in as large quantities as, having regard to the safety of the surface of said lands and the ability of the lessees, by the exercise of the best business skill and judgment to obtain a market for such coal, was reasonably practicable.

"2. In operating the mines then open on said premises and in projecting new mines or entries thereon, and in adopting any means, method or plan for taking and mining coal, to treat the demised premises, and the said right and privilege of taking and mining the coal thereunder, as an entire mining property, and to conduct the operations with a view of taking and selling the coal underlying the demised

lands as speedily and in as large quantities as practicable, as well as with reference to mining and taking the coal underlying the demised premises.

"3. Continuously during the term, in good faith and with all reasonable and practicable speed, to prosecute the work of mining the coal underlying the demised premises in a skillful and workmanlike manner, taking the coal therefrom in as large quantities and as thoroughly as could be practicably done by skillful and scientific mining and so that the surface should not be in any manner injured, and at no time during the term cease to so continuously prosecute said work, unless compelled by mobs, strikes or inevitable accident, and in case of cessation of work from any of the causes aforesaid, to resume such work as speedily as by the employment of the best business management and mining and engineering skill they could reasonably do.

"4. At their own expense in all respects to comply strictly with all laws of the United States or of Illinois then in force or which might be in force at any time during said term.

"5. At all times in mining said coal to so conduct its operations as that (at the expiration of the term mentioned, or the termination of the rights of the lessees thereunder during said term for any cause,) the entries, approaches or means of access to the coal not then mined, and the connections between the coal not then mined and the shafts or other means of hoisting the coal to the surface, should be clear and unobstructed, and the roofs and sides properly supported and in proper and suitable condition to enable persons reasonably skilled in mining to continue the work of taking the coal not mined from under the premises demised without hindrance or interruption, provided the lessees should be at liberty to conduct their operations in any vein or veins of coal underlying said lands as they chose, and might abandon the workings in one vein when they chose to work, and did actually work, another vein.

"6. To pay the lessor one-eighth of one cent per bushel for each bushel of lump coal hoisted through the shaft then constructed or thereafter to be constructed upon the premises and sold by the lessees during the term; all coal hoisted and sold by the lessees during any month to be paid for in cash on or before the 20th day of the next succeeding month; lessees to keep in a book provided for that purpose an accurate account of all coal hoisted and sold from all mines and shafts on the premises, which book, and all other books, papers or memoranda of the lessees from which the true amount of coal hoisted and sold could be ascertained, to be at all reasonable times open to the inspection and examination of the lessor by its authorized agents or attorneys, and with full liberty to take copies, etc.

"7. To pay the lessor each year, except the first, of said term $1250, whether the coal taken at the rate aforesaid should equal that sum or not; and if the monthly payments for the first year did not amount to $1250, then within thirty days after the expiration of such year, except the first, to pay the lessor a sum which, with the monthly payments made during the year, would amount to $1250.

"8. To defend all suits and pay all damages from injury to the surface of the ground.

"9. That a specific and first lien be created in favor of the lessor upon all tools, appliances, animals, appurtenances, fixtures and improvements at any time during the term placed by the lessees upon the premises, to secure the lessor in the payment of all sums due it under the terms thereof, and to indemnify it against all loss, damage and detriment occasioned by the non-performance by the lessees of their part of the lease, such lien to continue for sixty days after the expiration of the term and until the lessees have paid the lessor everything due it, and until the lessees have paid the lessor for all loss and damage as may have been occasioned by the non-performance by the lessees of any part of the lease.

"10. At the end of the term thereby granted, to quit and surrender to the lessor the possession of the premises demised and those in which the right to take coal was granted, in good condition, as an entire mining property, leaving all shafts or other means of hoisting coal from the interior to the surface, and all entries or other means of reaching coal not then mined from the place where mined to the bottom of such shafts, safely and securely supported according to the improved usages of mining, and so that the lessor, by the exercise of ordinary skill in mining, and by the use of the machinery and appliances then on the mines, or other like machinery and appliances, might continue the work of taking coal from under said demised premises and the premises in which the right to take coal was granted, with reasonable convenience and without hindrance or interruption, the tenement houses, personal property and fixtures on said premises at the beginning of the term to be returned in as good condition as then, ordinary wear and tear use excepted.

"11. Not to assign the premises, or any rights under the lease, without consent, in writing, of the lessor; provided, if the lessees, within ninety days after the date of the lease, should cause a corporation to be organized to operate under the terms of the lease, the lessor to consent to the substitution of such corporation to the rights and liabilities of the lessees, upon the execution of proper conveyances or assignments, and when such substitution should be so effected the lessees would be discharged from the obligations thereof.

"The final clause of the lease is as follows: 'Finally, at the expiration of the term hereby created, the lessor shall purchase all the property of the lessees then on said premises, except the property used or connected with the tile works and brick yard which may then be thereon; and will pay the lessees the value of all improvements of a permanent character made to and then on said premises and which shall have been made to and placed there by the lessees, except the improvements connected with the tile works and

brick yard, the price and value of such property and improvements to be fixed upon the basis of the actual cost to the lessees, with a proper abatement for the wear and tear thereof by the lessees, to be determined by the appraisement of arbitrators indifferently chosen in the usual manner, the decision of a majority of said arbitrators to be binding; and the lessees agree to sell such property and accept as payment therefor the price and value so to be fixed; the brick yard and tile works property to be removed by the lessees within ninety days after the termination of the lease.'

"The lessees took possession, under the lease, of the real and personal property therein described and conducted mining operations thereunder until September 10, 1887, when the appellee, the Springfield Junction Coal Company, having been organized and incorporated as contemplated by the eleventh clause of the lease, said lease was duly assigned to it and mining operations were conducted by it thereunder until the expiration of the term, July 1, 1897.

"June 21, 1897, before the expiration of the lease, appellant filed its original bill against the Springfield Junction Coal Company, alleging the execution of the lease; its assignment to said Springfield Junction Coal Company; that said assignee company had failed to comply with the covenants and conditions in said lease requiring the lessee to surrender to the lessor, at the expiration of the lease, the leased premises, with the appurtenances and property necessary to constitute an entire mining property, so that the appellant or any one reasonably skilled in mining could, 'without hindrance or interruption, continue the work of taking coal from the demised premises,' but was about to sell, dispose of and remove such property from the demised premises, to the great and irreparable injury of appellant. In pursuance of the prayer of the bill a temporary injunction restraining the Springfield Junction Coal Company from 'removing, selling, disposing of and disturbing railroads and cars, or any of the machinery, appliances, appur-

tenances or improvements, and all and every means used in and necessary for the operation of said mines or the tenement houses or other buildings, personal property or fixtures upon or in said premises,' was issued, and remained in force until dissolved by the final decree.

"The Springfield Junction Coal Company answered the bill, and on January 29, 1898, filed its cross-bill, alleging that on the day after the expiration of the lease it attempted in good faith to carry out the provisions of the final clause · of the lease, whereby the value of the property involved was to be fixed by appraisal and paid for by appellant; that because of the fault of appellant no appraisement was made; that during the term of the lease a large part of the property which it thereby secured from appellant wore out by use, so that it had to be replaced by new; that a new escapement shaft had to be sunk and the old one abandoned in order to safely and successfully mine the coal from the demised premises,—all of which it had the right to do under the lease. The cross-bill concludes with a prayer that the whole controversy be determined in that proceeding, and that appellant be required to pay the Springfield Junction Coal Company the value of the property and improvements mentioned in the final clause of the lease.

"Subsequently appellant filed its amended and supplemental bill against appellee, alleging that when the Springfield Junction Coal Company took possession, the property leased was in good condition as an entire mining property, and there were upon and in said premises a large number of buildings, machinery, top works, hoisting apparatus, boilers, pumps, railway tracks, cars, shafts, entrances, and a large amount of personal property used in operating the mines and in connection therewith, all in good repair and condition; that during the term of said lease the Springfield Junction Coal Company used and enjoyed all said property until the same was worn out and it became necessary for it to substitute or supply other therefor; that in operating

said mines it sunk a shaft upon said premises in addition to those sunk and used when the lease was executed and when it went into possession, and it also extended the railway tracks on which cars were used for the purpose of conveying the coal mined in said premises from the place where the same was mined to the bottom of the shaft, in order that it might be hoisted to the surface, and it continued to conduct its mining operations with the complete equipment leased as aforesaid, until shortly before the termination of the lease; that prior to June 21, 1897, the Springfield Junction Coal Company, in disregard of the tenth clause of the lease, tore up some of the railway tracks in said mines and took and carried away the iron rails and ties used in the construction thereof, and prior to said June 21 removed from said premises a barn and other buildings and other property, being part of the demised premises described as tenement houses, personal property and fixtures; that the Springfield Junction Coal Company did not during the term keep the tenement houses and other buildings, machinery, fixtures and other personal property in good repair, order and condition, but negligently suffered the same to become in bad condition, and during the term of the lease tore down, removed, or caused to be torn down and removed from the premises, many of the tenement houses and other buildings, machinery, fixtures and personal property and converted the same to its own use, and on the expiration of the term and the abandonment of the premises by the Springfield Junction Coal Company such of the tenement houses, other buildings, machinery and fixtures and personal property remaining upon said premises and surrendered to appellant were in bad condition and of little or no value; that it would require the expenditure of a large sum, to-wit, $20,000, to repair the tenement houses and other buildings, machinery, fixtures and personal property that remain and to replace or substitute those used up and destroyed; that at the beginning of the term there was on the

premises a shaft known as the Old South shaft, which was used for hoisting coal from the mines to the surface, and there were then entries and approaches running from said shaft to the coal under said premises; that the Springfield Junction Coal Company did not during the term properly support the sides or roofs of the entries or approaches from and to the Old South shaft, but negligently permitted the roofs and sides thereof to cave and fall in, and at the expiration of the term the shaft and entries and approaches connected therewith were obstructed and in such ruinous and impassable condition as to be of no value in working said mines, whereby the appellant had been greatly hindered in working said mines, and in order to clear the said shaft, entries and approaches and restore them to usable condition, the expenditure of a large sum of money, to-wit, $131,707, would be required; that said company did not surrender said premises in such condition that appellant or persons reasonably skilled in mining could continue the work of taking coal from under said premises without hindrance or interruption, but said premises, at the expiration of said term, were surrendered by the said Springfield Junction Coal Company in such bad and ruinous condition that appellant was hindered and delayed in taking coal from the premises, whereby it suffered damage in a large sum, to-wit, $25,000; that when the Springfield Junction Coal Company took possession under the lease, the shafts, entries and approaches connected therewith and necessary to the operation of the mines were all upon the lands of appellant and under or through or upon lands of which appellant had the right of possession for mining purposes and of drifting or running entries or approaches, and said shafts, entries and approaches were then and there connected as an entire mining property; that said Springfield Junction Coal Company opened and sank other shafts not on the property of appellant but on property and premises belonging to others, and projected and drifted entries and extended the same from

222—39

those on the premises and mining property of appellant
through premises and property not belonging to appellant
but to others, and in which appellant had no interest or
right of way, towards or to the coal belonging to appellant,
and at the expiration of the term surrendered to appellant
said mining property in such condition that it had no right
to use said shafts, drifts and entries so projected and ex-
tended on the property of others, and cannot operate its
mines as an entire mining property without delay or hin-
drance, whereby appellant is compelled, in order to operate
said mine, to either sink or provide legal shafts for escape-
ment and other purposes, or to project drifts and entries on
and through property which it owns and has a right of way
over, or use the entries so projected, drifted and extended
through the property of others, in either case to the great
expense, cost and damage of appellant of $15,000; that the
Old South shaft on said premises consisted of two compart-
ments for hoisting cages and one compartment for air, and
there was also upon said premises and connected with said
mines an escapement shaft constructed in accordance with
the requirements of the laws of the United States and of
Illinois, and there was also an escapement entry connecting
the mines on the premises with the Black Diamond mine,
and said shafts and entry were necessary for the proper and
legal workings of the mine and the safety of the miners em-
ployed therein; that the Springfield Junction Coal Com-
pany, during the term of the lease, abandoned the Old South
shaft and converted said escapement shaft into and used it
for a main or hoisting shaft, and negligently failed to keep
the roofs and sides of the entries connecting the Old South
shaft with the escapement shaft, and negligently failed to
keep the escapement shaft connected with the Black Dia-
mond mine properly supported and in proper condition and
repair, whereby the roofs and sides caved in, and the es-
capement connection between the Old South shaft and the
Black Diamond mine was cut off from said shaft as a main

or hoisting shaft, and in place of the Old South shaft and es-
capement entries, as aforesaid, the Springfield Junction Coal
Company sank a combined air and escapement shaft on
premises in which appellant had no right, title or interest;
that said shaft was condemned by the State inspector of
mines for the fifth district of Illinois as an unfit and illegal
means of escape and not in compliance with the laws of Illi-
nois; that the Springfield Junction Coal Company, in vio-
lation of the lease, did not, during the term thereof, treat,
use or leave the said premises as an entire mining property;
that the escapement shaft so sunk by the Springfield Junc-
tion Coal Company is upon lands not owned by appellant
and of no use or value to appellant; that in order to operate
the mine it will be necessary for appellant to provide a fit
and legal escapement and air shaft on the premises at an
expenditure of $5000; that when the Springfield Junction
Coal Company took possession there were two railroad
tracks belonging to appellant, with switches, one connecting
with the Chicago and Alton railroad and the other with the
Wabash, with top works so arranged that coal could be dis-
charged and delivered into cars on either track and so that
shipments of coal could be made by either and both rail-
roads; that the Springfield Junction Coal Company took
up and converted the material in said railroad tracks to its
own use and did not lay down or build other tracks in place
or substitution thereof, also tore down the top works and
converted same to its own use, so that now coal can be deliv-
ered only to the Wabash railroad and on the track belong-
ing to it, for the use of which, in having cars placed thereon
for the purpose of having the same loaded with coal, it is
obliged to pay a rental of $54.62 per year and keep the track
in repair; that the rails of the track are owned by the Wa-
bash railroad, which can take up and remove the same and
discontinue the track any time at its pleasure; that the cost
and expense of re-constructing and restoring the tracks and
switches making connection with the Chicago and Alton as

it was at the time the Springfield Junction Coal Company took possession reasonably amount to $3000, and the cost and expense of re-constructing and restoring the track and switches making connection with the Wabash railroad as it was when it took possession reasonably amount to $2000, and the cost of restoring the top works, including chutes and other arrangements, as they were when it took possession, so that coal can be handled and loaded into cars on both railroads as expeditiously as before, reasonably amounts to the sum of $25,000; that in disregard of the covenants of the lease the Springfield Junction Coal Company did not enter in its books a large amount of the coal mined and raised from said mines and disposed of by it, but so increased the size and measure of the meshes of the screens that a large amount of the coal falling through said screens was of good merchantable and marketable quality and possessed of great value, and the Springfield Junction Coal Company did not account for the said coal so fraudulently permitted and caused to be passed through the screens, but sold the same and converted the proceeds therefrom to its own use, to the injury of appellant in the sum of, to-wit, $6534.51; that when the Springfield Junction Coal Company took possession of the mines there were valuable entries run or extended in advance of the workings, to the extent of, to-wit, 2100 feet, so that the prosecution of mining operations of the mine could be conducted extensively and profitably and without hindrance or interruption; that in violation of the lease the said Springfield Junction Coal Company, when it surrendered possession, left no entries in advance of the workings of any amount by means of which the mining operations could be carried on profitably and without let, interruption or hindrance, but caused the entries to be worked out and to become exhausted, and operated said mines in such manner and surrendered them to appellant in such ruinous state and condition that on account thereof it is unable to profitably carry on the mining

operations in said mine without first incurring great expense and delay in causing drifts or entries to be extended and said mines to be put in proper repair and condition so that the mining operations can be legally conducted or carried on profitably, by means whereof it is damaged in a large sum, to-wit, $100,000. The bill concludes with a prayer for an accounting, assessment of damages and general relief.

"Appellee answered the amended and supplemental bill, and upon issue joined the cause was referred to the master in chancery to take and report proofs, with his conclusions. After the master to whom the cause was first referred had filed his report, appellant petitioned the chancellor to re-refer the cause to the then master to take additional proof relative to injury and damage accruing to appellant by the wrongful acts of appellee, and upon a consideration of such petition the chancellor ordered that the cause, and all testimony theretofore taken before the former master, and the report thereupon by said former master, and all objections filed to such report, be re-referred to the then master in chancery, Charles A. Keyes, and that said master allow the appellant to offer additional proof upon the question of injury and damage to the mine 'by means of or as a result of water flowing or percolating into said mines, or any part thereof, from the shafts of said mine or shafts made by the defendants, or any of them, and connecting said mines,' and report his conclusions of law and fact upon the whole case.

"The master filed his report of proofs and findings, and upon the controverted questions involved his conclusions were substantially as follows:

"1. That appellee was not liable to appellant for moving or changing any of the property from one place to another upon the demised premises.

"2. That at the termination of the lease the appellee company turned over to appellant the mine, premises and personal property in good condition as an entire mining

property, except that through the negligence of the appellee company water had come down the escapement shaft made by it and was lying in the south-west part of the mine; that appellant had expended $800 in removing said water and should be reimbursed therefor.

"3. That after the termination of the lease appellant was compelled by a State mine inspector to open up the way between the mine of appellant and the Black Diamond mine, at a cost of $1100; that said way was obstructed by the neglect of the appellee company and it should reimburse appellant therefor.

"4. That the appellee company should pay appellant $150 for sixty pit cars which it received from appellant and which it sold and received the money for.

"4½. That the charge by appellee company of $2660 for the construction of an escapement shaft upon lands purchased by it from Samuel H. Jones should not be allowed against appellant, because said escapement shaft was placed upon other lands than the demised premises.

"5. That appellant was not liable to pay appellee company the sum of $1547.50 paid by the latter to Samuel H. Jones for 10.20 acres of land, because the appellee company took the title to the said land to itself and there the title remained.

"6. That appellant should be reimbursed by the appellee company in the sum of $360 for six mules which were on the premises at the termination of the lease and which the appellee company removed and kept.

"7. That at the time appellee company delivered up possession there were no rails on the north side of the mine in its haulage-ways that were fit to be used, and that appellant was compelled, before it could operate the mine, to purchase steel rails and place them in the haulage-ways on the north side of the mine at a cost of $437.37 for the rails and $42 for spikes, making $479.37, and appellant paid out for the labor of laying out said tracks on the north side $480, mak-

ing in all $959.37, for which appellant should be reimbursed.

"8. That when appellee company surrendered the mine there were not connected with it any top scales, and appellant thereupon purchased top scales at a cost of $92.76 and at a cost to set them up of $27.60, making in all $120.36, for which appellant should be reimbursed.

"9. That appellee company removed from the demised premises, without authority, a stable and placed the same upon its own premises and converted it to its own use; that said stable was worth $100, and that appellant should be reimbursed therefor.

"10. That the value of the personal property remaining upon the demised premises at the time appellee company surrendered the premises and the value of all improvements placed upon said premises by said company was in the aggregate $13,290.90.

"11. That appellee company was not liable in damages to appellant for the condition and want of repair of the tenement houses situated upon the premises; that said tenement houses were in as good repair and condition at the termination of said lease as they were at the beginning thereof, and appellee company was not liable to appellant for the destruction by fire of the building that was situated upon the demised premises known as the hotel.

"12. That appellee company was not liable in damages for the condition or removal of the switches connecting said mine with the Wabash and Chicago and Alton tracks; that when appellee company took possession of the mine there was no switch connecting it with the Chicago and Alton tracks, and that the switch connecting it with the Wabash track was in bad repair and afterwards was re-built by the appellee company, connecting shaft No. 2 with the Wabash railroad track.

"13. That appellee company was not liable to appellant for the price given to Mrs. Jessie V. Price for the land purchased from her by appellant.

"14. That shaft No. 2 was left by appellee company at the expiration of the lease in such a condition as to enable persons reasonably skilled in mining to continue the work of taking the coal not mined from under the demised premises without hindrance or interruption, except that appellant had not the right to use the escapement or air shaft placed by the appellee company on lands that were not part of the demised premises, and the other exceptions before stated.

"15. That appellee company paid appellant one-eighth of one per cent per bushel for each and every bushel of merchantable lump coal raised or hoisted by or through the mines or shafts operated by it during the term of the lease, whether said coal came from the demised premises or the land leased from Jessie V. Price.

"16. That appellee company selected as arbitrator Williams Wilms, but appellant did not select an arbitrator until ordered by the court, and that no third arbitrator was chosen and no appraised value of the permanent improvements and property upon said demised premises was then fixed specifically in compliance with the lease, and that it was the fault of appellant that the third arbitrator was not chosen.

"17. That the main entry driven by appellee company at shaft No. 2 beyond the first three hundred feet is an improvement to the mining plant, and that after the expiration of the lease the lessor should pay to the lessee for the same, as it is a permanent improvement.

"18. That at the time Solomon, Gray and Annie M. Loose commenced to operate the shaft No. 2 as a hoisting shaft, the Wabash Railroad Company tore up the switch which led from the track to mine No. 1, known as the Old South shaft, and that Solomon, Gray and Loose made an agreement with the Wabash Railroad Company for the building of a switch from its main track to shaft No. 2, and that the labor and ties were furnished by Solomon, Gray and Loose, and the rails were the property of the railroad

company, and that at the time Solomon, Gray and Loose took possession of the mining property under the lease there was no switch connection between the shafts No. 1 and No. 2 with the track of the Chicago and Alton railroad, and there never was during the term of said lease any switch connection between the said shafts with the track of the Chicago and Alton railroad, and that appellee company is in no way liable to appellant for the cost of constructing switches from the mines to connect with the tracks of either the Wabash or Chicago and Alton railroad.

"19. That Solomon, Gray and Loose took down the engine chutes constructed at shaft No. 1 under an order made to them by the Wabash Railroad Company, and said order was made for the removal of'said chutes at shaft No. 1 for the reason that they overhung and were on the ground of the railroad company, and that Solomon, Gray and Annie M. Loose were under no obligations to replace said chutes at their own expense.

"20. That Jessie V. Price did not convey to appellee company fifty-five hundredths of an acre of land, or any land, to be used by the appellee company for the purpose of placing thereon an escapement shaft, and that no escapement shaft was placed upon any part of the land of Jessie V. Price by appellee company, but that the said appellee company did place an escapement shaft upon lands purchased by it from Samuel H. Jones, and said escapement shaft was not placed upon the demised premises, except a corner of it rests upon a very small fractional part of the lands of appellant.

"21. That Solomon, Gray and Loose, after they took possession of the demised premises, took and removed from said mine the water that was standing on the bottom in all parts thereof, and that when appellee company took possession of said mine on July 1, 1887, there was no water in the mine; that the water that was found in the mine by Solomon had been removed.

"22. That after allowing appellant all proper charges and claims as a credit, and charging appellant with the value fixed by the evidence upon all and several the property of appellee company on the premises and permanent improvements made thereon at and before the time of the termination of the lease, except the property used by and connected with the tile works and brick yard on the premises, there was due from said appellant to the said appellee company $5493.77.

"To this report of the master appellant filed fifty several objections which were overruled by the master, and the objections were thereupon filed as exceptions to said report on the hearing before the chancellor. The chancellor overruled all the exceptions of appellant to the master's report except as to two items charged to appellant as permanent improvements made by appellee company, viz., one of $1000, for 1120 feet of main entry through the field from which the coal was taken out by the appellee company during the lease and one of $45 for a powder magazine, allowed the appellee company, and ordered and decreed that the original bill be dismissed for want of equity, that the injunction issued thereon be dissolved, and that the appellee company, complainant in the cross-bill, have and recover from appellant the sum of $4448.77, with costs of suit.

"As grounds for reversal of the decree it is urged by appellant, generally, that it is predicated upon an erroneous construction of the lease and of the rights, obligations and liabilities of the respective parties thereto; that the account between the parties was stated upon wrong premises, and that the case should be remanded for a proper accounting under specific directions by this court. Particularizing, appellant claims, first, that the appellee company should be required to pay the cost of re-opening and putting the Old South shaft in a workable condition; second, that appellee company should be charged not only with the expense of opening the escape way connected with the Black Diamond

mine, but also with the necessary cost of procuring a right of way for such escape way over the intervening property of Mrs. Price; third, that appellee company should pay the value of certain entries which were open when the lease was made and which were opened by appellee company and subsequently abandoned or allowed to become closed by it, or should pay the reasonable cost of re-opening and putting the same in proper condition; fourth, that appellant is entitled to damages for the extension by appellee company of mining operations into adjoining land belonging to Mrs. Price, the amount of such damages to be measured by the cost of extending entries on appellant's property equal to those extended on the Price land, less the value of the coal that would be extracted in so doing; fifth, that appellee company should respond in damages to the extent of the value of the hotel and tenement houses destroyed by fire during the term of the lease; sixth, that appellee company should respond in damages for its alleged failure to put and keep the mine in good condition and repair; seventh, that appellant should be allowed the value of top works, switches, trestles, chutes, etc., alleged to have been torn down and destroyed by appellee company; eighth, that appellee company should respond in damages for its alleged failure to surrender the demised premises in good condition as an entire mining property, so that appellant could at the end of the term proceed to mine coal without hindrance, delay or interruption; ninth, that appellee company should be required to surrender to appellant the escapement shaft on the Jones land as an accretion to the mining property, and in the alternative, if said shaft shall not be held to be an accretion, appellee company should pay the cost of constructing such a shaft on the demised premises under its covenant in the lease to return the demised premises in good condition as an entire mining property.

"This case is characterized by counsel for both parties as one involving interminable detail, and after an exami-

nation and consideration of 1087 pages of an abstract of a record containing 2200 pages, we readily confirm such characterization.

"The provisions of the lease are not difficult of apprehension, and manifestly express the intention of the parties to it and determine their relative rights and obligations so clearly and comprehensively as not to permit a recourse to extraneous facts and circumstances in aid of their construction or interpretation. It is clearly apparent from the express terms of the lease that it was executed with a view to profit to the lessor in the payment of royalty by the lessee upon coal mined from the demised premises and the conservation by the lessee of said premises as an entire mining property in good condition, so that at the end of the term the lessor might continue the mining of coal therein 'with reasonable convenience and without hindrance or interruption.' The lease distinctly provides that the lessee should have the use, during the term, of all mining property, of every description, upon the premises, and at the end of the term that the lessee shall return the same in as good condition as when received, ordinary wear and tear by use excepted, and that the lessor shall purchase from the lessee all the property of the latter then on the premises, and shall pay to the lessee the value of all improvements of a permanent character made by it and then on the premises. It was unmistakably contemplated that in the conduct and operation of the mine by the lessee some of the personal property and fixtures on the premises at the beginning of the term would be worn out by use and decay; that the lessee would necessarily be required to substitute therefor new property and fixtures and from time to time provide additional property and fixtures necessary for the proper operation of the mine, and for the same purpose, that the lessee would make certain improvements of a permanent character upon the premises. For all such the final clause of the lease provided compensation to be paid by the lessor to the lessee at the end of the

term. No other construction of the lease is possible, and there is no force in appellant's contention that the chancellor misconstrued the lease in that particular and that the account as stated is based on such erroneous construction.

"The evidence tends to show that at the beginning of the term the shaft known as the Old South was a combination hoisting and escapement shaft; that it had been used as such for about twenty years and had outlived its usefulness; that the entries connected with it had been worked out; that the escape way therefrom to the Black Diamond mine was impassable; that the timbers were rotten; that the top works were dilapidated, and that the mine could not be properly operated as an entire mining property by means of such shaft. This condition was apparent to the original lessees before the assignment of the lease to appellee company, and they immediately took steps to convert shaft No. 2 on the premises into a hoisting shaft, and to that end removed all the available machinery and top works from the Old South shaft to shaft No. 2. The lease provides that 'the lessees should have the right and privilege of removing part or all of the machinery, tenement houses, appurtenances and improvements from the place or places where the same were located, to such place or places on the demised premises, but not elsewhere, as they may deem proper,' and this provision was ample authority to lessees to make the removal from one shaft to the other. It was not contemplated, in case such right of removal was exercised, that the lessee should at the expiration of the term again remove all property back to its original location. If at the end of the term the lessee surrendered possession of the demised premises in good condition as an entire mining property, leaving all shafts or other means of hoisting coal and all entries or other means of reaching the coal not then mined, safely and securely supported according to the more improved usages of mining, so that the lessor, by the exercise of ordinary skill in mining, and by the use of the

machinery and appliances then on the mines, or other like machinery and appliances, might continue the work of taking the coal not mined from the demised premises without hindrance or interruption, it fully met its obligation under the lease. It does not appear that a re-instatement of the Old South shaft was necessary to effect the purposes of the lease or that appellant suffered any damage by reason of the failure of appellee to so re-instate it. Furthermore, there is no substantial evidence in the record upon which to predicate an award of damages if any resulted. Nearly four years intervened between the commencement of this suit and the close of appellant's proofs in the case,—ample time for appellant to have introduced evidence to establish damages and the amount of such damages, if any,—and we decline to remand the case, as suggested by appellant's counsel, to enable it to introduce such evidence and further prolong the litigation.

"There is no equity in appellant's contention that it should be reimbursed by appellee company in the sum of $140,000, being the amount paid by appellant for one hundred and forty acres of land claimed to have been purchased by it from Mrs. Price for right of way for the escape way connected with the Black Diamond mine. The decree awards appellant $1100 as the cost to it of opening up such escape way, obstructed by the negligence of appellee company, and under the proof this is the full measure of the liability of appellee company. The escape way in question existed long before the execution of the lease, and appellant had an easement therefor through the lands of Mrs. Price to the Black Diamond mine. The escapement shaft on the Jones land, referred to hereafter more particularly, was on December 4, 1897, declared by the State mine inspector not to comply with the law and to be an unsafe escape shaft, and appellant was ordered to connect its mine with the Black Diamond mine by means of such escape way. This appellant did under the assurance from the mine inspector that

the owners of the Black Diamond mine consented thereto, and such consent is not denied by appellant.

"There is nothing in the lease requiring appellee company to keep open and unobstructed entries in the mine which had been worked out at the time of the execution of the lease or which were opened and worked out by appellee company during its tenancy, except such as afforded access to coal not mined, and appellant is not entitled to damages on account· of any such entries left closed or obstructed at the termination of the lease. It is conceded by appellant that the proof in the record with reference to its claims for damages on account of closed and obstructed entries is too meager to furnish anything but an approximation of the amount of such damages, if any, and we are asked to remand the case to enable appellant to offer more definite proof with respect to such alleged damages. For the reasons heretofore given appellant is not in a position to urge such request.

"Construing the lease in its entirety, we are of opinion it did not permit the lessee to mine and take coal from other than the demised premises, and that the mining of coal by appellee company in adjacent lands belonging to Mrs. Price was a violation of the covenants of the lease. Appellant, however, is not in a position to claim damages for the acts of appellee company in that regard. The adjacent lands belonging to Mrs. Price were leased to appellee company with the full knowledge of appellant and without any protest or objection by it. Mrs. Price was a stockholder in appellant company and its treasurer, and upon all the coal mined from her land appellee company paid to appellant a royalty of one-eighth of a cent per bushel, and the same was accepted by appellant with full knowledge of the source of such royalty. In the face of such facts it would be grossly inequitable to mulct appellee company in damages, if any were proven, for a breach of the covenants in the lease against mining by in-strike.

"During the term of the lease five buildings, designated in the record as tenement houses and one building known as 'the hotel,' were destroyed by fire without the negligence or fault of appellee company, and it is insisted by appellant that under the covenant in the lease imposing the duty on the lessee to return the tenement houses, personal property and fixures on the premises 'in as good condition as when received, ordinary wear and tear use excepted,' it was incumbent upon appellee company to re-build said buildings, and upon its failure so to do that appellant is entitled to damages therefor. The evidence tends to show that 'the hotel' was a hotel in name only, and with the tenement houses constituted, at the beginning of the term, a lot of abandoned buildings, the abode of rodents and tramps and wholly worthless for any purpose; and that the tenement houses on the premises suitable for habitation were returned by appellee company at the end of the term in as good condition as when received. In the absence of a contract or express agreement a tenant for years, at common law, is only bound to treat the premises in such manner that no substantial injury shall be done them through his negligence or willful misconduct and must make fair and tenantable repairs, but is not bound to re-build premises which have become ruinous or accidentally destroyed by fire; neither is he liable for mere wear and tear of the premises, nor bound to replace any portion thereof worn out by time. (Taylor's Landlord and Tenant,—6th ed.—sec. 343.) There is no covenant by the lessee, in the lease in question, to repair or re-build, and we are of opinion that by the great weight of authority the stipulation in the lease to surrender the tenement houses, personal property and fixtures, at the expiration of the term, in as good condition as when received, ordinary wear and tear use excepted, is but the expression of the implied common law obligation resting upon the tenant and not a covenant to repair or re-build. A review of the authorities upon this question would unnecessarily extend

this already lengthy opinion. They will be found fully collated in the note to *Boardman* v. *Howard,* 64 L. R. A. 648. *Ely* v. *Ely,* 80 Ill. 532, is cited by appellant as authority for the position contended for by it, but an examination of that case shows that there was an express covenant by the lessee to repair. It does not appear that the hotel and tenement houses in question are necessary to constitute the premises 'an entire mining property,' and the covenant by the lessee to quit and surrender the same in good condition as such, did not require appellee company to restore the buildings destroyed by fire.

"The evidence upon the question of the alleged failure of appellee company to keep the mine in good condition and repair is close and conflicting. A careful consideration of the proof offered upon that question leads us to the conclusion that the finding of the master, approved by the chancellor, is not against the manifest weight of the evidence and is therefore conclusive upon us. *Siegel* v. *Andrews & Co.* 181 Ill. 350.

"For the same reason we are not at liberty to set aside the master's findings disallowing appellant's claim for damages for the value of certain top works, switches, trestles, chutes, etc., alleged to have been torn down and destroyed by appellee company. Furthermore, in this connection, the record is barren of proof of any damage resulting to appellant with respect to several of the items named. No proof was offered by appellant when the same was competent under the original order of reference to the master, and such proof being incompetent under the order re-referring the cause to take proof upon other specific matters, it was properly excluded as not within the scope of the order of re-reference.

"Appellant, at the termination of the lease, entered upon the demised premises and proceeded to mine coal without apparent hindrance, delay or interruption, and the premises were surrendered in good condition as an entire mining property, except that there was water in the south-west por-

222—'0

tion of the mine, and there was no escape way required by law except the shaft sunk by the original lessees on adjacent land belonging to Mr. Jones. For these violations of its covenant appellee company was required by the decree to pay the cost of removing the water, amounting to $800, and the cost of opening and removing obstructions in the escape way connecting with the Black Diamond mine, amounting to $1100. Appellant was not entitled to both an escapement shaft and an escape way connecting with the Black Diamond mine in order to constitute the premises an entire mining property. The report of the State mine inspector, Rutledge, shows that an escape way connecting with the Black Diamond mine was adequate for the purposes of the mine. And furthermore, the provisions of the statute of this State entitled 'Mines and Mining,' enacted for the especial protection of coal miners, only recognize and require one or the other, and not both means of escape, as necessary in a coal mine. Section 3, chapter 93, Hurd's Statutes of 1903, provides: 'For every coal mine in this State, whether worked by shaft, slope or drift, there shall be provided and maintained, in addition to the hoisting shaft or other place of delivery, a separate escapement shaft or opening to the surface, or an underground communicating passageway between every such mine and some other contiguous mine, such as shall constitute two distinct and available means of egress to all persons employed in such coal mine.' The hoisting shaft on the demised premises and the escape way connecting with the Black Diamond mine constituted the two sufficient means of egress from the mine required by statute.

"With reference to the escapement shaft sunk on the Jones land by the original lessees and their successor, the appellee company, the position of appellant is somewhat anomalous. Appellant in its amended and supplemental bill charges appellee company with having sunk a shaft not on the property of appellant but on property belonging to an-

other and in which appellant had no right or interest, and alleges that appellant has no legal right to use such shaft, and now claims and insists that such escapement shaft on the Jones land is an accretion and appurtenance to the mining property in question and belongs to appellant, and that appellee company is necessarily required to surrender the same to appellant under its covenant in the lease to surrender to it an entire mining property at the expiration of the term. By its cross-bill appellee company claimed from appellant $1547.50, the price paid by it to Samuel H. Jones for 10.20 acres of land upon which the escapement shaft was sunk, and $2660 as the cost of constructing said escapement shaft, upon the ground that they constituted improvements of a permanent character, which the appellant was required to purchase under the 'final clause of the lease.' Both claims were resisted by appellant, and denied by the master for the reason that the escapement shaft was placed on other land than the demised premises and that the title to such other land was in appellee company. The escapement shaft on the Jones land was sunk by the order and under the direction of a State mine inspector, and on land other than the demised premises because it was determined that there was no available place on the demised premises in which to sink such shaft. If such shaft had been sunk on the demised premises it would undoubtedly have constituted an improvement of a permanent character, for which appellant would be required, under the 'final' clause of the lease, to compensate appellee company. If the escapement shaft should be held to be an accretion to the mining property, appellant would still remain liable to compensate appellee company therefor. No objection was filed by the appellee company to the finding of the master denying its claim for compensation and no cross-error has been assigned by it in this court. Appellee company having surrendered an entire mining property, excluding the escapement shaft on the Jones land, and such escapement shaft being on the other

land than the demised premises, appellant is not bound to take it and compensate appellee company for it as an improvement of a permanent character on the demised premises, and we cannot enforce compensation under the tender of appellee company, because no cross-errors are assigned by it.

"Other questions not controlling are discussed by counsel in argument, but their consideration is not necessary to the determination of the case.

"We are satisfied that the decree is predicated upon a proper construction of the lease; that appellee company surrendered to appellant, at the expiration of the term, the demised premises in good condition as an entire mining property except in the particulars heretofore mentioned and for which appellant's claim for damages was allowed, and that the decree of the court below is supported by the evidence and should be wholly affirmed."

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*